**E-FILED**
Thursday, 18 September, 2008  08:49:11 AM
Clerk, U.S. District Court, ILCD

### IN THE UNITED STATES DISTRICT COURT
### FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| STEVEN W. SCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  07-3182 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |

### <u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

Plaintiff Steven W. Scott appeals from a final Decision of the Social Security Administration (SSA) denying his application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416 and 423.  Scott brings this appeal pursuant to 42 U.S.C. § 405(g). The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D).  <u>Motion for Summary Judgment (d/e 9)</u>; <u>Motion for Summary Affirmance (d/e 11)</u>.  For the reasons set forth below, the Court determines that the SSA's Decision is supported by the law and the evidence.  The SSA's Motion for Summary Affirmance therefore is

allowed, and Scott's Motion for Summary Judgment is denied.

FACTS

Scott applied for DIB on August 25, 2005.  He alleged that he suffered from degenerative joint disease in his neck, spinal canal stenosis, shoulder problems, depression, and anxiety, all of which made it impossible for him to work after April 25, 2004.  At the time, Scott was working as a book company offbearer.  The SSA denied Scott's claims initially and on reconsideration.  Scott requested a hearing, which was held November 14, 2006.  On February 9, 2007, an Administrative Law Judge (ALJ) issued a Decision denying Scott's application.  The Appeals Council denied Scott's request for review, and Scott now seeks judicial review.

A.  MEDICAL HISTORY

1.  PHYSICAL IMPAIRMENTS

Scott alleges that his medical problems date back to injuries he suffered in a February 1991, car accident.  The accident caused a cervical spine injury, and in February of 1992, Scott underwent a cervical laminectomy, or disc removal.  He also received physical therapy.  In April of 1994, Scott quit his job and applied for social security benefits.  The SSA denied his application, and he began working again in 1995.  In 1996 and

1997 he did not work, but he returned to work in 1998 and continued until April of 2004.

Periodically throughout the 1990s and early 2000s, Dr. Chandupatia Prabhakar treated Scott.  Dr. Prabhakar's notes reference repeated complaints of neck pain, and in 1997, MRI results showed nerve cord displacement in the neck.  In February of 2004, Scott reported a flare-up of neck pain, and Dr. Prabhakar prescribed physical therapy.

On March 10, 2004, while Scott was at work emptying a box of books, he heard and felt a snap in his wrist.  Pain and swelling followed.  Scott went to the emergency room the next day, and x-rays showed no fracture.  Doctors found a tear in the radial palmar capsule, however, and Dr. Mark Greene performed surgery on March 25, 2004.  In April and May of 2004, Scott went through post-operative physical therapy, and therapists noted that he met all recovery goals.

In June of 2004, Scott visited Dr. Mark Greene and complained of chronic pain in his right shoulder.  Dr. Greene performed an arthroscopic subacromial decompression.  Scott received physical therapy after the operation, and his therapists discharged him to home exercises within six weeks.  They found that he had increased his strength to a level of 4/5 and

decreased pain to a level of 2/10.  Subsequently, on September 2, 2004, Dr. Greene ordered an MRI, which revealed "moderate spinal stenosis," "significant dorsal spondylitic change bilaterally," and "some flattening of the cervical cord."  Administrative Record (d/e 7) (R.), 242.

On October 1, 2004, Scott saw Dr. Brian K. Russell, a neurosurgeon, for an initial evaluation.  Scott indicated that most of his complaints related to neck pain, but he also experienced numbness and tingling in his hands.  Scott reported that even before his car accident, he suffered chronic neck problems.  The accident exacerbated his problems, and he eventually had an anterior cervical fusion operation.  After the operation, he had physical therapy and chiropractic treatments but found no relief.  Dr. Russell examined Scott and found limited motion in his neck, particularly on extension.  He found "good strength" in Scott's "deltoids, biceps, triceps, and wrist extensors," however, and noted that Scott's sensation is generally intact, that he suffers from no unusual spasticity, and that his gait is unremarkable.  R. 289.  Dr. Russell also reviewed MRI scans and found extensive degenerative cervical disc disease.  Dr. Russell concluded that Scott's symptoms were related to his cervical spondylosis.

Scott returned to Dr. Russell November 10, 2004.  He reported

increasing frustration with neck pain.  Dr. Russell noted that Scott had significant degenerative disc disease but stated that he doubted any operation would alleviate his neck pain.  "Surgery obviously works best if there is a significant radiculopathy, and he has no radiating pain at all.  He seems quite frustrated and I have recommended that he be seen by a pain specialist, and we have set him up to see Dr. Narla."  R. 288.

On December 15, 2004, Scott saw Dr. Koteswara Narla and complained of cervical pain radiating into the right shoulder and tingling and numbness in his hands.  Dr. Narla found a "significant tender point on the right side over the scapular border and the trapezius area, which seems to be triggering the pain with tenderness in the paraspinal and trapezius area."  R. 278.  Dr. Narla noted that epidural injections had not benefitted Scott.  Scott told Dr. Narla that he currently estimated the pain to be 8/10 in severity.  He reported that the pain interfered with his appetite, sleep, physical activity, social relationships, and emotions.  Dr. Narla diagnosed "cervical spondylosis producing cervical myofascial type of pain with trigger point" and carpal tunnel syndrome.  Id.  Dr. Narla prescribed pain relief medications and trigger point injections; he also noted that Scott might want to consider nerve conduction studies regarding his carpal tunnel

syndrome.

On January 7, 2005, Scott saw Dr. Narla again.  He reported that he could not tolerate the pain medications and found that the trigger point injection helped only for a few days.  The pain remained at a severity of 8/10.  Scott told Dr. Narla that he did not want to consider surgery but would return to physical therapy.  Dr. Narla noted that he did not see "any point in repeating the trigger point injections."  R. 276.  On January 26, 2005, however, Scott again returned to Dr. Narla, and Dr. Narla's notes reflect another trigger point injection and the recommendation that Scott return for another in four weeks.

Scott returned to Dr. Narla for a follow-up visit on April 1, 2005.  Dr. Narla's notes state that an "MRI of the cervical spine showed a moderate spinal stenosis at C3-4 with spondylitic changes.  There is a fusion at the C4-5 disk space noted, no evidence of any spinal stenosis noted at that level.  Mild narrowing of the C5-6 disk space."  R. 274.  Dr. Narla conducted a physical examination and found that Scott suffered slightly more pain in cervical movements to the right side and tenderness of the paraspinal muscles.  He noted no sensory or motor deficits.  Scott told Dr. Narla that he did not want surgery, medications, or injections, and Dr. Narla informed

him that there was little left to offer.   Dr. Narla arranged for nerve conduction studies and a needle examination regarding the carpal tunnel syndrome, however.

Dr. Narla found that the nerve conduction studies showed mild carpal tunnel syndrome at the right wrist but no evidence of carpal tunnel syndrome on the left side.   He also found no evidence of neuropathies or plexopathy.

Scott saw Dr. Russell again on May 10, 2005.   Dr. Russell noted that Scott was concerned about neck pain but had no radiating arm pain or radicular findings.   He ordered a cervical myelogram and contrast-aided CT scan.   Dr. Lucy Christopherson performed a CT cervical myelogram on May 20, 2005.   She found severe spinal canal stenosis.   On May 25, 2005, Scott returned to see Dr. Russell, and Dr. Russell noted that testing showed that Scott suffered from "rather severe stenosis."   R. 286.   Thus, in Dr. Russell's view, Scott was a candidate for an anterior cervical discectomy and interbody fusion.   Scott agreed to consider the surgery.

On June 14, 2005, Scott saw Dr. Russell again.   At this visit, Scott reported that he was doing much better and had experienced no numbness or tingling in his arms over the last couple weeks.   Dr. Russell noted that he

had a long discussion with Scott about surgery at this visit. Dr. Russell advised that while Scott suffered "rather severe stenonis," there was "no urgency to pursue operative treatment" because his symptoms were not extensive. R. 285. Dr. Russell recommended continued observation.

Scott saw Dr. Russell for another visit August 2, 2005. Dr. Russell noted that Scott's symptoms appeared to have stabilized. Scott denied any difficulty walking and reported that he experienced no numbness for several days. Dr. Russell could find no clear focal weakness and noted that Scott had "relatively normal motion of his neck." R. 297. He also stated that Scott had requested approval to resume a job search; Dr. Russell "recommended that he stay at a relatively light duty position." R. 297. He also advised that while Scott could return to work, he should work part-time and lift no more than 20 pounds.

On September 20, 2005, Dr. Russell examined Scott again and found nothing new; he found Scott's exam stable. Dr. Russell noted, however, that Scott had grown increasingly frustrated, which appeared to have exacerbated his depression. Because Dr. Russell thought Scott's worry about his physical impairments was harming his mental health, he recommended surgery. Scott agreed to consider surgery. In October and November of 2005, Dr.

Russell reiterated his surgery recommendation.

In November of 2005, Dr. Charles Kenney reviewed Scott's medical records for the SSA. He concluded that Scott could only occasionally lift or carry 20 pounds and had occasional balance limitations, but he found no other limitations.

In the spring and summer of 2006, Scott returned to Dr. Greene complaining of pain in his elbow. Dr. Greene found no bone or joint abnormality and recommended physical therapy.

Scott saw Dr. Russell for a follow-up appointment May 19, 2006. Dr. Russell noted that Scott was complaining of proximal arm pain, discomfort around his elbow, and tingling in his arm. He stated that Scott seemed obsessed with his neck and adamant about undergoing new studies. Dr. Russell told him that the elbow pain could not be related and while he doubted any change in Scott's condition, he had no objection to new tests. Dr. Russell arranged for the additional tests.

On June 22, 2006, Scott saw Dr. Claude Fortin for EMG and nerve conduction studies. Dr. Fortin found the results consistent with "bilateral median neuropathies at the wrists, mild in nature and neuropractic in type, right worse than left." R. 391. He also found:

> The patient's neuromuscular examination suggests shoulder pathology, right median humeral epicondylitis, extensor tenosynovitis at the wrist.  These pains are similar to some of his chief complaints, notably.   The above-noted radiculopathy correlates with the patient's previous surgery, without any active denervation demonstrated.   The left median neuropathy is subclinical, the right is clinically manifested as carpal tunnel syndrome.

R. 391-92.

A month later, on July 11, 2006, Dr Greene noted that Scott continued to complain of pain in his right elbow, but his range of motion was full and smooth.  Dr. Greene recommended right carpal tunnel release surgery.

2.   <u>MENTAL IMPAIRMENTS</u>

Scott's mental impairments also date back to the period following his car accident in 1991.  Scott returned to work after the accident, but began to suffer anxiety, and his physician referred him to a psychiatrist.  The psychiatrist, Dr. Glen Pittman, concluded that Scott was suffering from intense anxiety and depression.

From 1996 through at least August of 2005, psychiatrist Fareed Tabatabai treated Scott.  In a report to the SSA, Dr. Tabatabai stated that Scott had suffered depressive symptoms for more than 10 years.  He also

stated that Scott had "obsessions/compulsions," but noted that they had improved with medication. R. 312. Dr. Tabatabai stated that Scott was focused on caring for his parents to the exclusion of any other interests. He explained that Scott provided 24-hour care for his parents in his home. Dr. Tabatabai found Scott's mood to be "ok," but his affect blunted. R. 313. He reported that Scott suffered no hallucinations or delusions and engaged in relevant coherent speech. Dr. Tabatabai diagnosed Scott with major depression and obsessive compulsive disorder. He noted that his prescribed treatment -- Prozac and Klonopin – was stable. Dr. Tabatabai believed Scott could handle his own funds, but regarding his ability to do work-related activities, he thought "pt unable to do more than he is now." R. 315.

In the summer of 2005, Scott began seeing a "rehab counselor," James Marsh. In February of 2006, Marsh filled out an SSA questionnaire regarding his treatment of Scott. He stated that he saw Scott when Scott came to his office, "approx. four or five times" in seven months. R. 127. For most questions, Marsh stated that he could not provide an opinion. Marsh indicated, however, that before Scott's impairments began, Scott could work without pain or discomfort. Marsh also noted that Scott did not

provide care for anyone other than himself.  In conclusion, he noted that Scott "was considered to be severely handicapped due to the injuries to his cervical spine and subsequent treatment as well as his psychiatric condition."  R. 133.

On November 10, 2005, SSA consulting examiner Fred Stelling, MA, performed an examination as well.  Stelling performed memory, verbal, and judgment tests on Scott.  He found that Scott's short-term memory was limited, but his long-term memory was adequate.  He found Scott to have limited abstract generalization and borderline abstract verbal concept formation abilities and a seventh grade reading level.  Stelling also concluded that Scott had borderline conventional judgment.

Initially Scott was reserved with Stelling but soon began to express anger and frustration over his neck injury pain and disability denials.  He told Stelling that pain prevented him from getting more than 3 to 5 hours of sleep each night.  Scott indicated he had low energy and appetite and no personal interests.  He explained that he used to go to Cardinals games but now finds them boring.  He also expressed concern that when he goes out in public, people talk about him.  Scott told Stelling that he believed the best part of his life was over; while he had experienced suicidal thoughts, he

no longer cared enough to commit suicide.  Scott reported past alcohol use but denied current use.

Stelling diagnosed Scott with mood disorder with depressive features due to pain.  He also noted that if medical exams did not verify the existence of his claimed physical impairments, Scott may be afflicted with somatoform disorder.  Regarding Scott's ability to work, Stelling found:

> Steve's deficits in auditory immediate memory and short term memory, would suggest difficulty effectively following verbal vocational directions.  His 7th grade reading level would limit his use of vocational instructions to brief noncomplex written material.  His low average math/change making could be vocationally viable.
>
> Steven's lack of sleep/energy and fatigue would project an unmotivated employee who would have difficulty maintaining a productive/competitive work pace.  His hopeless self concept could suggest an employee with little confidence in work ability.  His claimed constant pain, would also effect his vocational productivity.

R. 329.

An SSA psychiatrist, Dr. Carl Hermsmeyer, reviewed Scott's records and offered an opinion December 1, 2005.  He found that Scott's abilities to understand, remember, and carry out detailed instructions were moderately limited, but he found no other significant limitations.  Dr. Hermsmeyer concluded:

The claimant has a diagnosis of mood disorder due to pain associated with a neck injury with depressive features. His cognition is basically intact. His persistence and adaptability are primarily limited by his general medical condition. The mental status exam and the activities of daily living indicate the severity does not meet or equal any mental listing, but is more than non-severe. Although the claimant may have problems with understanding, remembering and the ability to carry out detailed instructions. The claimant retains the mental capacity to perform simple one and two-step tasks at a consistent pace.

R. 332.

On January 31, 2006, Scott returned to Dr. Tabatabai's practice and saw a Dr. Stoll on an emergency basis. Scott reported that he had been drinking a case of beer a day and blacked out the night before. Dr. Stoll recommended intensive outpatient or inpatient therapy. On March 2, 2006, Scott returned to see Dr. Tabatabai. He stated that he had been drinking less.

## B.  ADMINISTRATIVE HEARING

Scott's administrative hearing took place November 14, 2006. He, his wife, and a vocational expert, Mr. Mallich, testified.

At the time of the hearing, Scott was 52 years old, 6'2", 180 pounds, and right handed. He was married to Cheryl Scott and had two adult children. He lived with his wife in a mobile home. His sole source of

financial support was his wife's income.

Scott graduated from high school in 1972.  Subsequently, he worked in pest control.  Scott did not attend college, but he received training in the insurance business; he took and passed three state tests required to sell insurance.  From 1988 to 1994, Scott worked as an insurance agent.  In 1991, after his car accident, he was off work for a few weeks.  He did not work in 1996 or 1997 because he was suffering from depression.  In 1998 and 1999, he stocked shelves in a store but resigned from that job in the fall of 1999 because of pain he was experiencing.  He then worked as a book company offbearer, which involved stacking books, until April of 2004.  He resigned because of his neck and shoulder pain; he also suffered a torn ligament in his left wrist around the time he resigned.

Scott testified that while he drank during all of these jobs, he did not leave any of them for alcohol-related reasons.  At the time of the hearing, he was drinking only occasionally.  He denied ever drinking a case of beer a day but testified that at one point, he was drinking almost that much to compensate for his pain.  He stopped because it did not work.  He never received any treatment for alcoholism.

Scott  testified  that  he  currently  suffers  from  several  physical

impairments.  His shoulder is tight and sore, and he cannot lay on it.  He has lost strength in his right arm, and his hands fall asleep.  When his pain is at its worst, he cannot do much with his hands.  When he tries to lift things, it hurts his lower back, shoulder, neck, and lower head area.  He cannot turn his head in every direction.  When he tries to turn his head, he gets dizzy and experiences pain directly behind his neck, running up into his head and down into his shoulders.  When he reaches, "it just tightens up." R. 420.  Lifting a full glass creates pain all the way up his shoulder and neck. He cannot lift a full gallon of milk, but he can lift and pour a quart of milk. He cannot hold a quart out from his body for long, however.  If he sits down and concentrates, he probably can do things like sorting nuts and bolts and putting a nut onto a screw.  He can button clothes if he takes his time, but he has problems with zippers.  Riding in a car is also problematic because he gets stiff and tired.  Scott testified that he gets physically and mentally worn out by everyday activities, such as getting the mail, reading the paper, and brushing his teeth.  At night, he wakes up within two or three hours of falling asleep.  Stiffness or numbness in his right arm wakes him up.

Mentally, Scott believes his anxiety has increased and his concentration level has deteriorated over the last few years.  He suffers

mood swings related to his pain levels.  When his pain is worst, he is very quiet and does not talk to his wife or snaps at her.

Scott testified that he can take care of his personal hygiene, but no housework because it strains his neck and causes anxiety.  Occasionally he will pick up a loaf of bread or quart of milk, but generally his wife does the grocery shopping.  He used to mow the grass, but for the last year his wife has done it.  Scott used to take care of his parents.  His father died several months before the hearing, but he still takes care of his mother.  His mother lives a few miles away.  He never provided yard work, meals, or grocery shopping, but he would take his parents for doctor's appointments and pick up their medications.  He currently visits with his mother.

Scott testified that he sometimes watches sports games and went to two baseball games with his wife the summer before the hearing.  They left by the seventh or eighth inning, however, because he had to stand up and sit down.  Scott used to fish but now cannot stand or sit long without his neck and shoulders tightening.  He is a member of the Knights of Columbus but has not been active for two or three years.  Scott testified that he visits with his children and with a friend who lives across the street.  He watches television and reads the newspaper and TV Guide.  He gets stiff at the

computer, however, and he cannot concentrate on the Internet.  He does not play cards.

Scott's wife testified as well.  She stated that Scott is moody, but she cannot correlate his moods with anything in particular.  She testified that Scott has had serious alcohol abuse problems, but she did not think he currently had such a problem.  Regarding Scott's focus, concentration, and attention, she explained that she often has to tell him things more than once.

The ALJ asked Mallich, the vocational expert, a series of hypothetical questions regarding a person with Scott's past work history, education, and age.  First, she asked him whether such a person limited to light and sedentary work, no climbing or working at unprotected heights, routine and repetitive work, and minimal over-the-shoulder work could perform Scott's previous jobs.  Mallich testified that only the book stacking position would be possible for such an individual.

Next, she asked Mallich what other jobs would be available to such an individual.  He testified that this person could work one of the 39,420 light cashier jobs, one of the 2,309 light and unskilled counter clerk jobs, one of the 7,817 light and unskilled retail sales jobs, one of the 3,354 light

information clerk jobs, or one of the 7,702 unskilled order clerk jobs. He added that these jobs are representative.

If such a person were limited to lifting 10 pounds or less, however, he could not perform the light jobs. Moreover, if such a person were limited to only occasional bilateral reaching or handling, the previous book stacking job and the cashier, unskilled sales, information clerk, and order clerk jobs would be unavailable. Such restrictions would erode the base of available jobs significantly.

## C.   THE ALJ'S DECISION

The ALJ concluded that Scott was not disabled for social security purposes and issued her Decision on February 9, 2007. Preliminarily, the ALJ determined that Scott met the insured status requirements of the Social Security Act. She then discussed the five-step analysis set out in 20 C.F.R. §§ 404.1520 & 416.920. The analysis requires a sequential evaluation of: (1) whether the claimant is engaged in substantial gainful activity; (2) the severity and duration of the claimant's impairment; (3) whether the impairment equals a listed impairment in Appendix 1; (4) whether the impairment prevents the claimant from doing his past relevant work; and (5) whether the claimant can perform other work, given his residual

functional capacity, age, education, and past work experience.  20 C.F.R. §§ 404.1520(a)(4) & 416920(a)(4).  The claimant has the burden of presenting evidence and proving these issues on the first four steps.  The SSA has the burden on the last step; the SSA must show that, considering the listed factors, the person can perform some type of gainful employment that exists in the national economy.  Knight v. Chater, 55 F.3d 309, 313 (7ᵗʰ Cir. 1995); Roth v. Shalala, 45 F.3d 279, 282 (8ᵗʰ Cir. 1995).

The ALJ then applied this analysis to Scott's request for benefits.  First, the ALJ held that Scott had not engaged in substantial gainful activity after April 25, 2004.  Second, the ALJ found that Scott suffered from cervical spine problems, a left wrist injury, right carpal tunnel syndrome, impingement syndrome of the right shoulder, depression, anxiety, obsessive-compulsive disorder, and substance addiction disorder.

Third, the ALJ found that none of Scott's impairments equaled a listed impairment.  Specifically, she held that Scott's cervical condition does not satisfy any musculoskeletal listing; his spine, wrist, carpal tunnel, and impingement impairments do not meet or equal any musculoskeletal or neurological listings; and his mental impairments do not satisfy any of the B or C mental health listing criteria.

Fourth, the ALJ concluded that Scott cannot perform his previous jobs. She found that he has the residual capacity only to perform routine and repetitive light work and no climbing at unprotected heights or over-the-shoulder work.

Regarding his physical condition, the ALJ found that Scott suffers severe impairments, but not completely disabling ones. The ALJ discussed Scott's complaints of constant neck and shoulder pain, inability to lift much, limited range of motion in his neck, dizziness when reaching overhead, and fatigue. She also explained that Scott had been diagnosed with moderate to severe spinal stenosis, limited cervical motion, and right carpal tunnel syndrome and noted that he had undergone surgery for his right shoulder. Nonetheless, she concluded that other medical factors suggested only limited impairment:

> An October 1995 examination indicated restrictions of cervical motion, but no motor weakness or sensory deficit (Exhibit 1F). Dr. Russell ordered cervical steroid injections in October and November 2004, but the October 2004 examination showed good strength, no sensory problems, no spasticity and an unremarkable gait. Dr. Russell encouraged the claimant to exercise. In November 2004, the claimant reported no radiating pain at all. In May 2005, he said he had no radiating arm pain. Dr. Russell noted no radicular findings, no unusual myelopathy and no spasticity. Dr. Russell saw the claimant in preparation for a cervical fusion in June 2005. He reported no recent

numbness or tingling in his arms, and recommended that the claimant not have surgery (Exhibit 6F). . . . In May 2006, Dr. Russell noted complaints of arm tingling and elbow pain and told the claimant that this did not have anything to do with his cervical stenosis (Exhibit 20F). Dr. Greene wrote in July 2006 that the claimant had pain in his right elbow, but "smooth and full" range of motion. A nerve conduction study showed a C6 radiculopathy with involvement of the right median nerve, and Dr. Greene recommended a right carpal tunnel release and sent the claimant for physical therapy (Exhibit 22F). The study showed that the radiculopathy correlated with previous surgery without any active denervation demonstrated. It is noted at Exhibit 22F, that the claimant seemed obsessed with his neck and insisted on repeat studies; it is also noted that the claimant complained of arm/elbow pain/tingling but had a hard time describing exactly where the pain was; the doctor noted that the simplest course would be carpal tunnel surgery.

R. 14-15.

Additionally, the ALJ discounted in part Dr. Russell's August 2005, recommendation that Scott could resume part-time work with a lifting restriction of 20 pounds. She explained that Dr. Russell did not indicate "what if any medical findings" limited Scott to part-time work and noted that, the same month, Dr. Russell found no clear focal weakness and concluded that Scott had relatively normal motion in his neck. R. 14. She also highlighted Dr. Russell's October 2005 finding that Scott was mildly myelopathic and his May 2006 finding that Scott's arm tingling and elbow pain were not related to his cervical stenosis. While the ALJ found Dr.

Russell's part-time work recommendation unreliable, she did credit his 20-pound limitation "as it is consistent with the medical evidence." R. 14.

Moreover, the ALJ did not find Scott's subjective reports of pain credible. She noted that he needs no assistive device to ambulate and needed no hospital or emergency room visits for pain after his alleged onset date. She stated that while Scott complains that pain prevents him from sleeping well, "usual objective signs of severe pain are not indicated in the record, such as abnormal weight loss or muscle atrophy due to not using various muscles because of pain." R. 15. Further, the ALJ found that Scott's daily activities, such as his abilities to drive five days a week, to run errands for family members, to attend baseball games, and to use a computer, suggest that he is not disabled. Specifically, Scott's ability to drive, brush his teeth, and feed himself demonstrate that he can reach and manipulate items with his hands. The ALJ also noted that many of Scott's alleged impairments are longstanding, and he was able to work at a more physically demanding job than she currently recommends even with these impairments.

Regarding Scott's mental condition, the ALJ found that he suffers severe impairments, but again, not completely disabling ones. The ALJ

surmised that many of Scott's mental symptoms are related to alcohol abuse. According to the ALJ, Dr. Tabatabai's treatment notes do not support a finding of disability because they fail to reference psychotic thinking or disabling depressive symptoms, and they state that medication has improved Scott's obsessive-compulsive disorder. Moreover, Scott sees family and friends regularly, so he is not severely socially isolated. While his wife testified to mood swings, Scott had mental impairments while working from 1987 to 1994 and no objective evidence suggests he manifested any social problems at work. Nonetheless, the ALJ concluded that "[d]uring times of symptom exacerbation (from all his mental impairments combined) and substance abuse, in combination with pain complaints, the claimant may have moderate problems with concentration, persistence and pace and is therefore limited to the performance of routine and repetitive tasks." R. 18.

The ALJ refused to afford controlling weight to the opinions of two mental health professionals. First, she discounted Dr. Tabatabai's statement that Scott is "unable to do more than he is now" as vague and unsupported. According to the ALJ, Scott has demonstrated that he can perform routine and repetitive work by driving his parents to appointments and running

errands for them, driving out-of-state for visits, and reading the newspaper.

Second, she rejected Stelling's conclusions:

> The claimant apparently presented himself in an unfavorable
> light when he attended his consultative mental exam in
> November 2005 (exhibit 12F); the consulting examiner
> diagnosed a mood disorder and rule out a somatoform disorder
> (apparently this non medical doctor did not observe limitations
> that matched the claimant's actual presentation so considered
> a somatoform disorder). None of the claimant's treating mental
> health professionals have diagnosed a somatoform disorder. The
> statements made to this examiner and the conclusions drawn
> therefrom do not appear to be reliable. The claimant reported
> a 7th grade reading level, problems with math, etc. However, the
> claimant demonstrated the reading and math ability to pass the
> three exams to qualify for selling insurance in the State of
> Illinois; he sold insurance for several years. There is no
> indication that the claimant's mental functioning has declined
> since he passed those exams, other than possibly when he
> engages in substance abuse, which has been reported to be
> drinking as much as a case of beer per day. The claimant
> reported to the consulting examiner that he last drank beer the
> previous week but there is no first hand evidence of how much
> or when the claimant drank/drinks; and the claimant's self-
> serving statements regarding his level of alcohol use has not been
> demonstrated to be particularly credible. His actual daily
> activities demonstrate a more reliable level of mental functioning
> than what the claimant reported to this consulting examiner.

R. 17.

Fifth, the ALJ found that the SSA satisfied its burden to show that

Scott can perform other work, given his residual functional capacity, age,

education, and past work experience. She cited the vocational expert's

testimony that a hypothetical individual with Scott's vocational profile and exertional and nonexertional restrictions could work as a cashier, counter clerk, retail salesperson, information clerk, and order clerk.  Because the ALJ found that a significant number of jobs that Scott could perform exist, she held that he is not disabled.

D.      THE APPEALS COUNCIL

Scott asked the Appeals Council to review the ALJ's Decision. On the section of the Request for Review form asking a claimant to explain why he requests review, Scott's attorney answered "see attached," however, the Court can find no supporting documentation in the Administrative Record. R. 7.  On May 9, 2007, the Appeals Council denied Scott's request for review.

ANALYSIS

Scott now asks this Court to find him disabled or remand to the ALJ for further consideration.  Scott argues that the ALJ improperly discounted the opinions of Dr. Russell, Dr. Tabatabai, and Mr. Stelling and should have found greater hand-related limitations in Scott's residual functional capacity.

The Court reviews the ALJ's Decision to determine whether it is

supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the ALJ's findings if they are supported by substantial evidence and may not substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The ALJ must at least minimally articulate her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the ALJ's analysis to determine whether the ALJ considered all important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).

First, the ALJ's decision to discount Dr. Russell's opinion was not error.  "A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."  Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001).  Yet, the SSA Commissioner, not a doctor selected by the claimant, decides whether the claimant is disabled.  20 C.F.R. § 404.1527(e)(1).  A treating physician's statement about the effect of a claimant's symptoms on his ability to work does not alone establish that a claimant is disabled.  Dray v. R.R. Retirement Bd., 10 F.3d 1306, 1311 (7th

Cir. 1993).  An ALJ is required to consider such statements, but not to accept them.  20 C.F.R. § 404.1529.  An ALJ may discount the medical opinion of a treating physician where the opinion is internally inconsistent or inconsistent with other evidence.  <u>Knight</u>, 55 F.3d at 314.

Here, the ALJ found that Dr. Russell's opinion that Scott could perform only part-time work was not well supported by medical findings: "Dr. Russell does not indicate what if any medical findings would limit the claimant to part-time work."  R. 14.  Moreover, the ALJ found his opinion internally inconsistent given that in the same visit, Dr. Russell found no clear focal weakness and noted that Scott had "relatively normal motion of his neck."  R. 297.  At this visit, Scott also denied any difficulty walking and reported that he had experienced no numbness for several days.  The ALJ noted that over the next several months, Dr. Russell found Scott's condition to be stable.

The ALJ articulated her analysis of the evidence, and the Court can track her analysis.  Scott argues that in analyzing Dr. Russell's part-time recommendation, the ALJ failed to address the fact that while Scott's November 2005, MRI showed no progression, both it and the prior May 2005, MRI showed moderate to severe cervical spinal stenosis.  R. 291.

Additionally, he argues that the ALJ ignored Dr. Russell's October 2004, diagnosis of "rather extensive degenerative cervical disc disease" and conclusion that most of Scott's symptoms are related to his cervical spondylosis.  R. 289.

Yet, the ALJ's opinion does not ignore these pieces of evidence.  She noted that the May 2005 MRI found moderate to severe spinal stenosis but concluded that these "medical records do not support a finding of complete disability."  R. 14.  She acknowledged the MRI results but held that they, and the rest of the record, failed to establish that a patient suffering from severe spinal stenosis could not work full-time.  While she did not specifically discuss the October 2004, finding of degenerative cervical disk disease, she stated that "the October 2004 examination showed good strength, no sensory problems, no spasticity and an unremarkable gait."  R. 14.  The ALJ is not required to address every piece of evidence, so long as a failure to discuss certain evidence does not make it impossible to track her analysis.  See Diaz, 55 F.3d at 308.  Given the ALJ's discussion of Scott's physical abilities at the time of the degenerative cervical disk disease diagnosis, the Court can track her analysis.  Thus, the Court will not disturb her Decision to discount Dr. Russell's recommendation of part-time work.

Second, the Court also finds no error in the ALJ's refusal to afford Stelling's and Dr. Tabatabai's opinions controlling weight.   Stelling concluded that Scott would have difficulty following verbal or written vocational directions and that his low math skills could be vocationally problematic.  He also found that Scott's fatigue would make it difficult for him to maintain a productive and competitive work pace and that his constant pain would affect his productivity.  As the ALJ noted, however, Stelling was not a treating physician; he was only a consulting examiner who saw Scott on one occasion.  Moreover, considering other evidence in the record, the ALJ found that Scott "presented himself in an unfavorable light" to Stelling, and therefore Stelling's conclusions were unreliable. R. 17.  The ALJ found that the seventh grade reading ability Scott displayed with Stelling was inconsistent with his graduation from high school and subsequent passage of three insurance licensing exams.  Moreover, the ALJ found that any decline in Scott's mental abilities since those tests related to his alcohol consumption, which Scott likely downplayed with Stelling.  Scott reported only occasional use and none in the last week, but the ALJ noted that no objective evidence confirmed his self-serving report.  Because Scott at the hearing did not admit he ever drank a full case of beer a day, as

reflected in his psychiatric records, the ALJ found his reports of alcohol consumption generally unreliable.  Additionally, the ALJ found that Scott's "actual daily activities demonstrate a more reliable level of mental functioning than what the claimant reported" to Stelling, which weakened Stelling's conclusions regarding the effects of fatigue and pain.  R. 17.

The ALJ clearly articulated her reasons for discounting Stelling's opinions.  The Court can track her reasoning and cannot identify significant contradictory evidence that the ALJ failed to address.  Thus, the ALJ's opinion is entitled to deference.

The same is true of her decision to discount Dr. Tabatabai's statement that Scott is "unable to do more than he is now."  R. 315.  The ALJ found this statement vague and unsupported, and the Court agrees with her assessment.  Scott argues that Dr. Tabatabai meant that Scott could do no more than care for his parents 24 hours a day in his own home, which Dr. Tabatabai indicated he was doing at the time.  First, the Court notes that Dr. Tabatabai's "unable to do more" statement does not refer explicitly to parental care, making this connection only a good guess.  Moreover, aside from Dr. Tabatabai's statement of 24-hour in-home care, the Court finds nothing in the record indicating that Scott ever provided this level of care

for his parents.  Scott's testimony at the administrative hearing suggests that his parents maintained their own home, had someone else provide lawn care and household maintenance, and were able to do their own grocery shopping and cooking.  Scott seems only to have driven them to doctors' appointments, picked up their medicine, and visited with them.  The fact that the level of care he provided is unclear demonstrates the vagueness of Dr. Tabatabai's opinion.  If Dr. Tabatabai's understanding of  what Scott was doing at the time was wrong, it is impossible to extrapolate from it to what Scott could do then or can do now.  Thus, whether or not the ALJ credited this opinion is irrelevant because it does not constitute substantial evidence of Scott's ability, or inability, to perform routine and repetitive unskilled work.

Third, substantial evidence supported the ALJ's refusal to impose particular restrictions on Scott's ability to reach, handle, and finger objects. Scott argues that his complaints of numbness in his arms and hands and his doctors' findings of carpal tunnel syndrome support restrictions on reaching, handling, and fingering, which in turn would eliminate the jobs the ALJ found Scott can perform.  Yet, the ALJ acknowledged that Scott suffers from carpal tunnel syndrome; she simply found that while this impairment might

contribute to his inability to lift more than 20 pounds, it does not disable him. Indeed, EMG and nerve conduction studies found only mild carpal tunnel syndrome. The ALJ concluded that Scott's daily activities, such as his ability to drive, brush his teeth, and feed himself, contradicted his assertions of a restricted ability to reach, handle, or manipulate. The ALJ clearly articulated her rationale, and the Court can track it.

THEREFORE, Scott's Motion for Summary Judgment (d/e 9) is DENIED, and Defendant's Motion for Summary Affirmance (d/e 11) is ALLOWED. All pending motions are denied as moot. This case is closed. IT IS THEREFORE SO ORDERED.

ENTER:   September 17, 2008

FOR THE COURT:

s/ Jeanne E. Scott
JEANNE E. SCOTT
UNITED STATES DISTRICT JUDGE